CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 16 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | | |
|---|---|---|
| JUDY S. ARGENBRIGHT, | ) | |
| Plaintiff, | ) | Civil Action No. 6:05cv00038 |
| | ) | |
| v. | ) | |
| | ) | By: Michael F. Urbanski |
| JO ANNE B. BARNHART, | ) | United States Magistrate Judge |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Judy S. Argenbright ("Argenbright") brought this action pursuant to 42 U.S.C. § 405(g) for review of the decision of the Commissioner of Social Security denying Argenbright's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This case was referred to the undersigned Magistrate Judge on March 21, 2006 for report and recommendation. Following the filing of the administrative record and briefing, oral argument was held on October 2, 2006. As such, the case is now ripe for decision.

The undersigned finds that substantial evidence supports the Commissioner's credibility assessment and determination that Argenbright retains the residual functional capacity to do some sedentary, unskilled work. Further, the undersigned finds that at step five of the sequential evaluation process for disability determination proper hypothetical questions were presented to the Vocational Expert, and that the expert identified several jobs which satisfied the criteria posed. Accordingly, it is recommended that the ALJ's decision be affirmed.

## I.

Argenbright was born on February 8, 1958, and completed the ninth grade.

(Administrative Record, hereinafter "R.," at 59, 424-25) After receiving her general equivalency

diploma, she completed Certified Nursing Assistant training. (R. 424-25) Argenbright's

previous work includes that of a Certified Nursing Assistant. (R. 75) Argenbright filed an

application for DIB on or about September 27, 2002, alleging that she became disabled on March

16, 2002, due to a wrist injury and pain in her back and knee. (R. 14, 74, 426-28) Argenbright's

claims were denied at both the initial and reconsideration levels of administrative review,

(R. 14), and a hearing was held before an administrative law judge ("ALJ") on June 21, 2004.

(R. 14, 421-40) On July 21, 2004, the ALJ issued a decision denying Argenbright's claims for

DIB, finding that Argenbright retained the residual functional capacity ("RFC") to perform a

significant range of sedentary work as long as the work is simple and routine in nature and would

allow her to alternate between sitting and standing at her own discretion and would not require

her to lift more than ten pounds or stand and walk for longer than six hours in an eight hour day.[1]

(R. 21, 23)

The ALJ's decision became final for the purposes of judicial review under 42 U.S.C.

§ 405(g) on March 31, 2005, when the Appeals Council denied Argenbright's request for review.

(R. 5-9) Argenbright then filed this action challenging the Commissioner's decision.

---

[1]Sedentary work is defined as work which may require exerting up to ten pounds of force occasionally and/or a negligible amount of force frequently, to lift carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may require some standing or walking for brief periods. However, jobs are sedentary if walking and standing are only required sometimes and the other sedentary job requirements are met. http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM

**II.**

Argenbright argues that the ALJ erred in finding her testimony was not wholly credible, that she retained the RFC for a significant range of sedentary work, and that she could perform substantial gainful activity. (Pl. Summ. J. at iii, 19) Accordingly, she requests that the decision of the Commissioner be reversed or, in the alternative, remanded for reconsideration of the findings. (Pl. Summ. J. at 27)

The Commissioner counters that substantial evidence supports the ALJ's determination that Argenbright was not disabled. (Def. Summ. J. at 11-20) The Commissioner claims that Argenbright failed to establish that she was medically impaired and that she lacked the RFC to work. (Def. Summ. J. at 4-5) Additionally, the Commissioner argues that the ALJ's determination that Argenbright retained the RFC to perform a significant range of sedentary work is amply supported by treating physicians' opinions, the lack of evidence of functional impairment, Argenbright's admissions regarding her physical and mental limitations, and credibility concerns regarding Argenbright's subsequent complaints of pain and panic attacks. (Def. Summ. J. at 13-20) Finally, the Commissioner argues that the ALJ's finding that Argenbright could engage in substantial gainful employment is supported by the medical record and testimony from the Vocational Expert ("VE") establishing that other work exists in significant numbers in the national economy for a person with Argenbright's limitations. (Def. Summ. J. at 12-13)

Judicial review of disability cases is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the conditions for entitlement under the Act. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th

Case 6:05-cv-00038-NKM-mfu   Document 21   Filed 11/16/06   Page 3 of 26   Pageid#: 112

Cir. 1966).  Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

Therefore, the questions presented are whether there is substantial evidence to support (1) the ALJ's credibility assessment; (2) the ALJ's finding that Argenbright's combined physical and mental conditions did not significantly impact her ability to work; and (3) the ALJ's determination that other work exists in significant numbers in the national economy for a person with Argenbright's mental and physical limitations.  The record at the time of the ALJ's decision amply supports his credibility assessment and his determination that Argenrbright retained the RFC to do some work.  Further, as the ALJ posed proper hypothetical questions to the VE and the VE identified jobs which met the criteria posed in those hypothetical questions, the undersigned finds that there was substantial evidence to support the ALJ's finding that other work exists in significant numbers in the national economy for a person with Argenbright's functional limitations.

## III.

First, Argenbright argues that the ALJ erred in finding her complaints regarding her allegations of disabling pain and mental defect were not totally credible.

In light of conflicting evidence contained in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).  Accordingly, the ALJ is not required to accept Argenbright's subjective allegation that she is disabled by panic and anxiety, but rather must determine, through an examination of the objective medical record, whether she

4

has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996). Then, the ALJ must determine whether Argenbright's statements about her symptoms are credible in light of the entire record. (R. 286-291) Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989).

Argenbright testified that she has swelling in her knee and neck, and the resultant pain is so severe she can only stand and/or sit for about fifteen minutes at a time, she sleeps fitfully, and is easily distracted. (R. 430-31) Additionally, Argenbright stated she suffers from depression and an anxiety disorder that is so severe she has at least four panic attacks a week. (R. 430-31) The ALJ considered this testimony in context of the entire record and determined that her statements were not wholly credible because they stand in marked contrast to the existing record and her documented ailments. (R. 23)

### A.     Physical Ailments

The ALJ found that Argenbright's allegations of disabling pain were not entirely credible based on her medical records and her reported daily activities. (R. 20, 23) Although the back, knee, and wrist problems of which Argenbright complains are documented in the record, it is clear these impairments have not resulted in the total disability alleged. On her daily activities questionnaire, Argenbright indicated that despite needing frequent rest breaks she cleans and dusts her home daily, prepares her own meals, and several times a week goes outside her home to grocery shop and to visit with friends and family. (R. 83-86) Additionally, she reported that she was able to pay her bills and spent several hours each day reading books, magazines, and the

5

newspaper, listening to music, and watching television. (R. 87-88) Similarly, during her state agency mental health assessment with Dr. Kessler on January 23, 2003, she reported that she shared the household chores, including laundry, cooking, and cleaning with her husband, that her daughter also sometimes helped out around the house, that she grocery shops once or twice a week, and that she visits with family and friends outside her home at least three times a week. (R. 351)

Argenbright's medical records likewise indicate that her physical ailments have not been totally disabling, but have been successfully managed with conservative treatment. Of significance, following each individual injury, Argenbright's doctors released her for full-time work after a course of treatment which included joint injections, therapy, and pain management. Further, on each occasion, Argenbright successfully returned to work until sustaining a subsequent injury.

Argenbright's records suggest she first stopped working due to back pain on February 23, 2001.[2] (R. 110) On March 9, 2001, Dr. Miller at Piedmont Orthopaedic Surgery ("Piedmont"), examined her and an epidural injection was scheduled for March 16, 2001. (R. 334) However, due to an undocumented illness, the injection was postponed until April 11, 2001. (R. 432-34) In the interim, Argenbright continued to miss work, but only received a Doctor's excuse for her absence from April 11, 2001 to April 25, 2001. (R. 432-34) During her recheck on April 30, 2001, Dr. Miller noted that the injection significantly reduced Argenbright's pain, and she could return to full-time work within ten days, which it appears she did. (R. 331)

---

[2]Argenbright's application claimed disability from March 16, 2002, but later moved to amend the alleged disability onset date to February 23, 2001. (Pl. Summ. J. at 2)

6

On May 31, 2001, Argenbright presented to Piedmont after her husband pushed her knee to one side causing it to pop. (R. 330) Dr. Miller noted that Argenbright's husband caused a subluxation of her patella, but that her obesity was a contributing factor to this injury. (R. 330) Approximately one month later, Argenbright advised her therapist that her knee was not causing her any pain. (R. 329) Dr. Miller's treatment records noted that Argenbright was improving and could return to work on July 4, 2001 and, apparently, she did so. (R. 329)

Argenbright returned to Piedmont on August 10, 2001, after falling on her outstretched hands and injuring her wrist at work. (R. 327) Argenbright was put in a thumb gauntlet and was advised to return for a recheck in ten days. (R 327) During the follow-up exam on August 22, 2001, Dr. Miller noted that Argenbright's wrist was improving and she could return to work the following week, which she did. (R. 326)

On November 20, 2001, Argenbright advised Dr. Miller that she reinjured her back at work and was now experiencing significant pain in her right groin and down her thigh. (R. 325) Dr. Miller ordered her to rest and miss work until December 3, 2001. (R. 325) Argenbright returned to work, but continued to complain of pain, and Dr. Miller directed her to discontinue working on January 25, 2002. (R. 322) Subsequently, Argenbright was given several epidural injections to minimize her pain, and Dr. Miller's office notes from January 28, 2002 reveal her back condition was improving and the injections had reduced her pain. (R. 236-38, 321-25)

An MRI of Argenbright's lumbar spine taken on February 11, 2002 showed no significant change from a previous MRI taken in 1997, which revealed degenerative disc disease at the L4-5 and L5-S1, mild annular disc bulge at the L4-5 with less significant change at the L4-5 level, and mild clumping of the nerve roots suggesting mild arachnoiditis. (R. 183) After reviewing the

7

MRI, Dr. Miller determined that Argenbright's back pain was probably caused by arachnoiditis, but that there was no evidence of a lesion. (R. 320) He rechecked her on February 19, 2002 for her wrist and tenderness in her neck. (R. 319) Dr. Miller noted that although Argenbright continued to have point tenderness in her neck, she maintained a full range of movement, and he suggested massage therapy. (R. 319) Additionally, Dr. Miller found her wrist was markedly improved. (R. 319) Argenbright subsequently returned to work on March 1, 2002. (R. 320)

Argenbright returned to Piedmont on April 8, 2002, after slipping and falling at work on March 16, 2002. (R. 16) Argenbright complained that during the fall she hyperextended her left knee, reinjured her back and wrist, and was now experiencing occasional numbness in her left thigh and pain in her left low back and lateral hip. (R. 316) Dr. Miller noted that she had no swelling or bruising in her wrists nor any numbness, tingling, or weakness in her hands. (R. 316) Additionally, he noted she had a full range of movement in her wrists, digits, and lumbrosacral spine. (R. 316-17) However, he did notice some tenderness in the left paraspinous musculature and point tenderness in the sacroiliac joint region ("SI"). (R. 317) X-rays of the left knee, lumbrosacral spine, and pelvis were normal. (R. 317) Dr. Miller injected her left knee and prescribed a pain reliever. (R. 317) During a recheck on April 25, 2002, Dr. Miller noted that Argenbright's knee remained symptomatic, but that her back pain severity was variable. (R. 315)

On June 4, 2002, Dr. Miller completed, on an outpatient basis, an arthroscopy of Argenbright's left knee. (R. 231-34) During a follow-up exam on June 11, 2002, Dr. Miller noted that though Argenbright's knee was improving, she had developed de Quervain's syndrome in her wrist from using the crutch. (R. 314) Both conditions continued to improve, and Dr. Miller's notes from June 27, 2002 indicate he released her to return to full-time work on

8

July 10, 2002. (R. 313) However, on July 7, 2002, Argenbright called Dr. Andrews complaining of significant pain and swelling in her wrist. (R. 312) She was examined on July 10, 2002, and Dr. Miller noted that Argenbright's knee was bothering her a moderate amount and that she needed a splint for her wrist. (R. 311) On July 25, 2002, Dr. Miller noted that Argenbright should wean herself from using the wrist splint, but that she was not yet ready to return to work. (R. 310) Argenbright was released to return to work on August 18, 2002, but she did not return to work because of complaints of severe gastric pain. (R. 309, 266)

Argenbright did not have a doctor's release for her continuing absence from work nor was she continuously hospitalized. In fact, despite her continuing complaints of gastric discomfort and her multiple appearances at the hospital, Argenbright's physicians found little diagnostic or other objective evidence to support her continuing claims of pain. (R. 272)

On September 13, 2002, Argenbright participated in a Functional Capacity Evaluation. (R. 287) During the test she demonstrated the ability to occasionally squat, crouch, forward bend, and climb stairs. (R. 287) Additionally, she lifted nine pounds to her shoulders and twelve pounds to her knees. (R. 287) Based on her performance results, Jamie Hupp, Exercise Physiologist, and Edward Velasquez, M.P.T, determined that Argenbright maintained the RFC to work at least at the sedentary level. (R. 288) Dr. Miller later agreed with this determination. (R. 306) Six days later, Dr. Andrews at Piedmont injected Argenbright's right wrist and right knee for a pain flare-up. (R. 308) The record suggests that sometime thereafter Argenbright lost her job due to her repeated, unexcused absences. (R. 307)

The next documented treatment for Argenbright's physical ailments is dated February 13, 2003. (R. 406) Dr. Andrews' treatment records from that day note that he had a lengthy

9

conversation with Argenbright during which she indicated her knee had improved with physical therapy, but that she had since stopped physical therapy, and that she continued to have difficulties with her wrist. (R. 406) Dr. Andrews directed Argenbright to restart physical therapy. (R. 406) The record suggests Argenbright continued to be treated at Piedmont for back pain with joint injections, but records related to those injections are missing. (R. 403) Progress notes from April through August 2003 indicate that Argenbright continued to show improvement with physical therapy and joint injections as needed. (R. 397, 400, 401, 404) On September 11, 2003, Dr. Andrews noted that Argenbright was making good progress with her de Quervain's, that her back pain caused only 2.5 % permanent partial disability, and though her knee still hurt, it did not require surgery. (R. 396)

On October 9, 2003, Dr. Andrews indicated that despite physical therapy, Argenbright continued to have increasing pain in her left SI region which was limiting her mobilization. (R. 399) He injected the SI joint and informed Argenbright that if this did not help the pain, he would consider an epidural. (R. 399) Dr. Andrews' treatment notes dated December 9, 2003 report that Argenbright continued to have pain in her right wrist and thumb, her knee, and her back. (R. 395) However, Dr. Andrews noted that he would continue to treat her with non-surgical management and he expected her problems to improve. (R. 395)

Argenbright returned on January 20, 2004, complaining that her back, wrist, and thumb were causing her a lot of pain, and an appointment at the pain clinic was set. (R. 418) Dr. Andrews did another trigger point injection on February 18, 2004, and she was scheduled for a facet block. (R. 417) However, during that exam Dr. Andrews noted that Argenbright had no muscle spasms or pain on palpation, a full range of movement, and that her wrist was getting

10

better. (R. 417) Argenbright reported on March 6, 2004 that her pain was decreasing, and on April 23, 2004, another trigger point injection was completed. (R. 415-16) At that time Dr. Andrews noted that Argenbright's wrist and knee were doing well and producing only intermittent pain. (R. 415)

Argenbright's claims of debilitating back, knee, and wrist pain are contradicted by her treating physicians' notes indicating her physical ailments were well managed with physical therapy and injections and by the fact that those physicians repeatedly released her to return to work. Moreover, Argenbright's reports to her physicians' regarding her progress and her ability to work belie her testimony of total disability due to pain.

## B. Mental Ailments

Although the record establishes that Argenbright suffers from depression and an anxiety disorder, it is clear that these diseases have not impacted her ability to function to the extent she testified. During her state agency medical consultation exam on January 6, 2003, Argenbright advised Dr. Dobyns that she had not suffered any anxiety attacks since September 2002 and that she did not believe her anxiety, depression, and panic attacks were disabling. (R. 342) This is consistent with the medical record which establishes that Argenbright has not been hospitalized for depression or anxiety symptoms since June 2002, that her depression and anxiety symptoms are well controlled with medication, that her symptoms flared and required hospitalizations when she took her self off her medications, and that she needs minimal counseling to maintain a state of well-being.

Argenbright's first documented treatment for mental health impairments in the record are from the Lynchburg General Hospital ("Lynchburg General") in April 2001. (R. 110-11) At

11

that time she complained of panic symptoms including chest pain, crying spells, and feeling constantly scared. (R. 110-11) During her exam, Lisa Riddlebarger, M.S., noted that Argenbright had been recently prescribed Serzone and Klonopin for depression and anxiety, yet Argenbright had decided not to take the medication. (R. 104, 109) Because her symptoms seemed to be escalating, Argenbright was admitted to the Mundy 3 unit at Virginia Baptist Hospital ("Virginia Baptist"). (R. 110-11) On admission, Argenbright advised the examining psychiatrist, Dr. Hill, that she had not taken her anxiety and depression prescriptions. (R. 102, 104) Dr. Hill restarted her on Serzone and Klonopin, and Argenbright was discharged two days later with a rapid and dramatic resolution of her symptoms. (R. 103)

Argenbright returned to Lynchburg General on July 27, 2001, with feelings of dizziness, nausea, difficulty sleeping, and suicidal thoughts, and she asked to be readmitted to Virginia Baptist. (R. 136) Subsequently, she was readmitted to Virginia Baptist, and during the intake exam Dr. Girling noted that Argenbright had been doing well on her regimen of anti-depressants and anti-anxiety medications, but that she had not been seeing the psychiatrist nor therapist as directed. (R. 130) Dr. Girling also noted that Argenbright's mood had been euthymic, her affect had been full, and she had been working without difficulty up until the day before the instant hospitalization.[3] (R. 130) Despite noting that by the time Argenbright arrived in the psychiatric ward she was no longer agitated nor suicidal, she was admitted overnight. (R. 139) The following morning Argenbright exhibited no symptoms of psychomotor agitation or retardation and asked to go home. (R. 129, 139) Argenbright was released that afternoon with directions to

_____

[3]Euthymia is a state of mental tranquility and well-being, neither depressed nor manic. Dorland's Illustrated Medical Dictionary 650 (30th ed. 2003).

12

continue on her medications and to contact the James River Counseling Center for further treatment. (R. 140)

Argenbright presented again at Lynchburg General on November 23, 2001 complaining of increasingly severe depressive and panic symptoms and requested to be readmitted to Virginia Baptist. (R. 151) During a mental health exam with Mark Beck, M. Div., M. Ed., Argenbright indicated that she ceased taking her anti-depressants and anti-anxiety medication three weeks earlier. (R. 151) Argenbright was readmitted to Virginia Baptist and during her intake exam she confirmed to Dr. Scott that she had discontinued taking her anti-depressants and anti-anxiety medication three weeks earlier because she felt they were unnecessary. (R. 147) On examination, Dr. Scott found that Argenbright appeared only slightly depressed and anxious, but nonetheless admitted her to the hospital. (R. 149) Additionally, he noted that Argenbright still had not seen a psychiatrist because of insurance difficulties, but was seeing a therapist at the James River Counseling Center. (R. 149-50) Dr. Scott admitted her to the hospital for inpatient care, restarted her on Serzone and Klonopin, and she was discharged three days later with significant improvement. (R. 145-50) Dr. Scott's discharge notes state that restarting Argenbright on anti-depressants and anti-anxiety medication "clearly" reduced her symptoms and that she was now quite stable. (R. 145)

Thereafter, Argenbright was treated by Dr. Judd for her mental ailments, and his treatment notes indicate her mental state continued to improve. (R. 339-40) Specifically, on January 24, 2002, Dr. Judd reported Argenbright's mood was euthymic, that she had intact cognition, a linear and logical thought process, and a GAF of 59. (R. 340) Likewise, his notes from February 28, 2002 reveal her affect was euthymic, her speech was spontaneous and normal,

13

and that she had intact cognition, demonstrated a linear and logical thought process, had full insight and judgment, and was not experiencing any hallucinations nor suicidal or homicidal ideation. (R. 339)

Argenbright returned to Lynchburg General on March 18, 2002 with complaints of chest pain. (R. 187) She was given Vistaril, another anti-anxiety medication, but after her discharge did not take it. (R. 187) Argenbright returned to Lynchburg General the next day complaining of chest pain, hot flashes, and severe panic attacks. (R. 195) Argenbright reported that her panic attacks had been increasing in frequency and duration over the preceding three days, and she was now having suicidal ideation. (R. 195) Argenbright advised the examining psychiatrist Dr. Whaley that Dr. Judd, her treating psychiatrist, had that day discontinued her Klonopin and Serzone prescription and started her on Paxil. (R. 195) Dr. Whaley found that Argenbright had a GAF score of 25 and had her admitted to Virginia Baptist. (R. 196)

Dr. Judd completed an intake exam following Argenbright's admission to Virginia Baptist. (R. 189) His notes indicate he had examined Argenbright three times since her hospitalization in November 2001, at that time she was discharged from the hospital on a regimen of Klonopin and Serzone. A medication change was initiated at her request on February 28, 2002 to Celexa, which she tolerated well. (R. 189) He also noted that after being advised during her initial exam at Lynchburg General the preceding day to take her anti-anxiety medication, she had declined to do so. (R. 189) On exam, Dr. Judd found that Argenbright had impaired judgment, insight, and a GAF of 35, but that she maintained good eye contact, her thoughts were linear and devoid of any looseness, and that she did not have any auditory, visual, or tactile hallucinations. (R. 189, 191) Additionally, Dr. Judd noted that despite denying any

14

abuse of alcohol or drugs, Argenbright tested positive for cannabis. (R. 190, 205) Argenbright's

medications were adjusted and by her discharge five days later, she had no symptoms of

depression, anxiety, or panic and reported that she did not have any suicidal ideation. (R. 185)

On his discharge note, Dr. Judd recorded that Argenbright's affect was bright, her speech was

spontaneous and normal, and that her insight and judgment were intact and appropriate. (R. 185)

Additionally, he found her GAF was 59. (R. 184)

Dr. Judd saw Argenbright again on March 26, 2002, and his treatment notes reveal that

her affect was euthymic, her speech was spontaneous and normal, and that she had intact

cognition, demonstrated a linear and logical thought process, had full insight and judgment, and

was not experiencing any hallucinations nor suicidal or homicidal ideation. (R. 338-39) On

April 11, 2002, Argenbright reported to Dr. Judd that she was not experiencing any anxiety.

(R. 337)

Argenbright returned to Lynchburg General on April 29, 2002, claiming that since her

hospitalization for diverticulitis on April 21, 2002, she had been very nervous and jittery, and

now wanted to be readmitted to Virginia Baptist. (R. 216) Argenbright indicated that she felt

scared all the time, she did not want people to be close to her, and felt like everything is coming

very fast. (R. 216) Joanne Chrysanthus, M. Ed., found that Argenbright had a GAF of 35 and

admitted her to Virginia Baptist. (R. 217) Dr. Judd subsequently examined Argenbright and

found her affect was mood congruent, her speech spontaneous, that she had intact cognition, and

that her thoughts were linear and logical, but that her insight and judgment were impaired.

(R. 210-13) She was discharged two days later with a GAF of 59 and with the direction to

continue taking her medications. (R. 208) Additionally, in his discharge notes, Dr. Judd

15

reported that Argenbright's mood was good, her affect was euthymic, her speech spontaneous, her thoughts linear, and her insight and judgment intact. (R. 209)

On June 26, 2002, Argenbright presented at Lynchburg General seeking a mental health consult claiming that over the preceding six days she had suffered escalating feelings of depression, suicidal ideation, and hallucinations. (R. 246, 248) Nurse's notes indicate that Argenbright advised a nurse on admission she had not taken her medication since the morning of June 25, 2002. (R. 250) After examining her, Lisa Riddlebarger, LPC, found that Argenbright had a GAF of 35 and admitted her to Virginia Baptist. (R. 249) During her intake exam, Argenbright told Dr. Miller that she has only had one previous anxiety attack which occurred in 2001. (R. 241-42) Additionally, Dr. Miller's notes report that Argenbright was "very angry" over her husband's infidelity and his lack of understanding of her medical issues, but that she specifically denied having any hallucinations, delusions, or suicidal ideation. (R. 242) Dr. Miller determined that Argenbright had a GAF of 50. (R. 242) Argenbright was discharged the next day with a GAF of 70, after one counseling session with Dr. Miller and her husband and restarting her medication. (R. 240)

Thereafter, Argenbright was not hospitalized for any mental defect. However, she continued to occasionally see Dr. Judd and a therapist. In July 2002 Dr. Judd reported that Argenbright was doing fairly well. (R. 335) She was next seen on September 19, 2002, and Dr. Judd's progress note indicates that Argenbright had a GAF of 52, she was not suicidal, homicidal, nor psychotic, and that she reported that her mood was "pretty good." (R. 392) Additionally, Argenbright informed Dr. Judd that although she continued to take an anti-depressant, she only took her anti-anxiety medication occasionally. (R. 392) Similarly, Dr.

16

Judd's notes from October 18, 2002 reveal that Argenbright's affect continued to be euthymic, her speech was spontaneous and normal, she had intact cognition, she demonstrated a linear and logical thought process, she had full insight and judgment, and she was not experiencing any hallucinations nor suicidal or homicidal ideation. (R. 335-36) Argenbright continued to be treated by Dr. Judd and, though his notes are nearly illegible, those notes reveal in March 2004 Argenbright was "really doing fairly well mentally" and was not experiencing any symptoms associated with panic attacks. (R. 410)

The only bit of the record which offers any support to Argenbright's testimony that she has panic attacks at least four times a week is the fact she told the Dr. Kessler during the State Agency mental health assessment on January 23, 2003 that she had panic attacks at least twice a week. (R. 354) However, as this stands in marked contrast to the remainder of the record, the ALJ had reason to doubt her credibility.

## C.

Argenbright's medical records, her disability applications, and her statements to her treating physicians certainly raise an issue as to the veracity of her testimony that her pain and mental disease has resulted in total disability. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (holding that a claimant's daily activities can suggest he is not disabled). And, as the ALJ's credibility determinations are entitled to great deference, the undersigned finds no reason to disturb his determination. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

17

# IV.

Second, Argenbright argues that the ALJ erred in finding that she maintained the RFC to perform sedentary work with some limitations.

The ALJ determined that although Argenbright suffers from degenerative disc disease of the spine, degenerative joint disease of the knee, de Quervain's syndrome of her right wrist, depression, and anxiety-related disorders which could cause the pain and the other symptoms alleged, her conditions were under good control with medication and localized injections and, thus, did not result in total disability. (R. 20) Further, he noted that her pain and mental disease are not so severe as to restrict her daily living activities or prevent her from concentrating or attending to a task. (R. 20) Then, citing the "general consensus" among her treating and examining physicians, the ALJ determined that Argenbright is able to do sedentary work as long as the work is simple and routine in nature and would allow her to alternate between sitting and standing at her own discretion and would not require her to lift more than ten pounds or stand and walk for longer than six hours in an eight hour day.[4] (R. 21, 23) Argenbright argues that this finding is inconsistent with her treating physicians' opinions and the state agency physicians' opinions.

The opinions of treating physicians are given controlling weight when those opinions are not conclusory and when they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other evidence in the record. 20 C.F.R.

---

[4]The undersigned finds there is not substantial evidence in the record to support the ALJ's determination that Argenbright can stand and/or walk for six hours. However, as this is not consistent with sedentary work and the ALJ specifically found that Argenbright could only do sedentary work which limits standing and walking to no more than about two hours, the court finds this to be a harmless error.

18

§§ 404.1527(d)(2), 416.927(d)(2). A treating physician's opinion may be assigned little or no weight if it is conclusory and/or is not supported by objective testing or the record as a whole. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). The ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). The ALJ did not disregard Argenbright's physicians' notes and opinions expressed therein. However, he did give little weight to Dr. Andrews' disability assessment to the extent it was inconsistent with the medical record and Argenbright's demonstrated physical capabilities.

On September 13, 2002, Argenbright participated in a Functional Capacity Evaluation. (R. 287) During the test she demonstrated the ability to occasionally squat, crouch, forward bend, and climb stairs. (R. 287) Additionally, she lifted nine pounds to her shoulders and twelve pounds to her knees. (R. 287) Based on these performance results, Jamie Hupp, Exercise Physiologist, and Edward Velasquez, M.P.T., determined that Argenbright maintained the RFC to work at least at the sedentary level. (R. 288) Her then treating physician, Dr. Miller, agreed with this finding. (R. 306) Likewise, after a medical consult exam in January 2003, Dr. Dobyns of the Virginia Department of Rehabilitative Services found that Argenbright was not wholly disabled. (R. 341-46) Dr. Dobyns determined that Argenbright suffered from moderate degenerative arthritis of the left knee, degenerative disc disease with arachnoiditis, probable de Quervain's syndrome in her right wrist, and anxiety depression with panic disorder. (R. 343) Nonetheless, he found Argenbright was able to do sedentary work, though he expressed concern over her ability to work full-time if her opportunities to change position were limited. (R. 343-

19

44) This finding was materially similar to the assessment of state agency physician, Dr. Amos, in February 2003. (R. 374-81) Dr. Amos determined that Argenbright maintained the RFC to occasionally lift ten pounds, frequently lift less than ten pounds, stand and/or walk at least two hours in an eight hour day, sit about six hours in an eight hour day, and had some limitations in her ability to push or pull with her upper and lower extremities. (R. 374-81)

Approximately five months later, in July 2003, at Argenbright's request, Dr. Andrews completed a fourth assessment of her ability to do work-related activities, and he essentially found Argenbright was unable to do any work. (R. 383-88) Specifically, Dr. Andrews determined that Argenbright could carry only five pounds, could stand and/or walk two hours in an eight hour work day, could sit two to three hours at a time, but would then need an opportunity to change position, was unable to climb, kneel, crouch, stoop, and/or crawl, could occasionally balance, and had some impairment in her ability to reach, handle, feel, and push/pull. (R. 383-84) He also noted, without explanation, that Argenbright's impairment caused height, vibration, and moving machinery environmental limitations. (R. 384) At the same time, Dr. Andrews completed a disorders of the spine questionnaire in which he noted that though Argenbright had cervical and lumbar spine impairments which cause some limitation in movement and muscle spasms, they did not result in compression of a nerve root nor have they caused a change in gait, loss of muscle strength, or atrophy. (R. 385) Dr. Andrews did not indicate that there were any other medical findings or conditions which contributed to her pain; however, he noted that her symptoms would interfere with her ability to maintain reliable attendance. (R. 388)

20

The ALJ disregarded Dr. Andrews' July 2003 assessment to the extent it was inconsistent with Argenbright's demonstrated physical capacity and the medical record as a whole, and found that Argenbright maintained the RFC to do some sedentary work. The ALJ's decision is supported by substantial evidence. As noted above, Argenbright's physicians repeatedly released her for full-time work with no restrictions and multiple physicians found that Argenbright retained the RFC to do sedentary work as long as she was able to change position. The ALJ disregarded Dr. Andrews' determination that Argenbright could never climb, kneel, crouch, stoop, and/or crawl, could not grasp any objects, and that her physical problems necessitate height, vibration, and moving machinery limitations because it was inconsistent with the record. In September 2003, Dr. Andrews reported that Argenbright's back condition caused only 2.5% partial permanent disability and her knee pain was not severe enough to warrant surgical intervention. (R. 396) His most recent treatment notes indicate that Argenbright's back condition continues to improve, her wrist is "really doing fairly well," and her knee only bothers her "some." (R. 415-17) Additionally, his notes indicate her physical ailments have not caused any changes in her gait, muscle atrophy, or a decrease in muscle strength. (R. 385, 388, 415) Moreover, Argenbright reported her knee, wrist, and back problems were improving and that she would continue with conservative treatment of rest, ice, and time. (R. 416) Neither Dr. Andrews nor any other treating physicians has indicate a need for permanent incapacitation or future surgical intervention. Accordingly, the undersigned finds that the ALJ's decision that Dr. Andrew's July 2003 conclusion as to Argenbright's physical limitations is not consistent with the record and, as such, is not entitled to controlling weight, is supported by substantial evidence.

21

The undersigned finds that there is substantial evidence to support the ALJ's determination that Argenbright retained the RFC to do sedentary work. As noted above, multiple physicians opined that Argenbright was physically able to do sedentary work as long as she had the option of changing position throughout the day. This is consistent with the ALJ's physical capabilities determination. Further, there is no evidence suggesting that Argenbright is mentally unable to do simple and routine work, as the ALJ determined. Argenbright testified and related on her daily activities questionnaire that she was able to pay her own bills, manage her household, and spent several hours each day watching television, listening to music, and reading. Further, the record reveals her anxiety and depression are well controlled with medication and she has not been hospitalized for symptoms related to these ailments for several years. Despite the fact that she informed Dr. Kessler in January 2003 that she suffered from panic attacks at least twice a week, Dr. Kessler opined that she can do simple and repetitive task and that workplace attendance would only become an issue if her panic attacks became so severe that she was unable to go out in public. (R. 354) Dr. Cerkevitch, the state agency psychologist, confirmed this assessment in February 2003, finding that Argenbright was able to do simple, routine tasks. (R. 371) Since those assessments, Argenbright's mental state has generally improved. For example, in March 2004, Dr. Judd reported Argenbright was doing well mentally and was not experiencing any symptoms associated with panic attacks. (R. 410) Accordingly, the undersigned finds substantial evidence to support the ALJ's RFC determination.

## IV.

Third, Argenbright contends that the ALJ erred in finding that there were significant numbers of jobs in the national economy for an individual with Argenbright's physical and

22

mental impairments. Specifically, Argenbright argues that there are no jobs available for a person with Argenbright's back, knee, and wrist problems who is totally restricted from stooping and who has handling and fingering limitations. Additionally, Argenbright argues the jobs cited by the VE as being available in the national economy are skilled or semi-skilled work according to the Dictionary of Occupational Titles ("DOT") guidelines, for which Argenbright is not qualified.

In addition to questioning Argenbright and considering her treating physicians' opinions, hypothetical questions were fully explored on the record with the VE. (R. 434-39) At the hearing, the ALJ asked the VE a hypothetical question as to the availability of jobs in the national economy for an individual of Argenbright's age, education, background, and experience and specifically whether sedentary jobs with simple, unskilled work and a sit/stand option were available. (R. 434-35) In response, the VE testified that Argenbright could perform a significant number of jobs in the national economy including that of an entry level receptionist, information clerk, and order clerk. (R. 434-35) The ALJ relied on this testimony to determine that a substantial number of jobs exist in the national economy for a person with Argenbright's limitations. (R. 22)

### A.

The ALJ's determination that Argenbright was able to do sedentary work, even if that work included occasional stooping and/or manipulating of objects, is well supported. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). Accordingly, such additional limitations need not be posed to the VE in determining if a significant number of jobs exist in the national economy for a person with Argenbright's other limitations. Thus, the ALJ's hypothetical was properly based on

23

all impairments he found credible based on the record evidence.  Walker v. Bowen, 889 F.2d 47,

50 (4th Cir. 1989), English v. Shalala, 10 F.3d 1080, 1085-86 (4th Cir. 1993).

**B.**

The VE testified that three categories of jobs were available for a person with

Argenbright's noted limitations: entry level receptionist, information clerk, and order clerk.  The

VE did not give any DOT listing number for these jobs nor did he offer any testimony as to the

DOT Specific Vocational Preparation ("SVP") rating assigned to each job, but rather testified

that these jobs were simple and unskilled.  (R. 434-35)  Argenbright argues that these jobs are

assigned DOT listing numbers of 237.367-038, 237.367-022, and 249.362-026, respectively, and

each of these three jobs has an SVP rating of four which takes them out of the category of

unskilled work.

The SVP rating for each job is used to determine the amount of time required by a typical

worker to learn the techniques, acquire the information, and develop the skills needed for average

performance in a specific job-worker situation.  Dictionary of Occupational Titles, App. C (4th

ed. 1991).  Unskilled work is work which requires little or no judgment to do simple duties, can

usually be learned in thirty days, and which has an SVP rating of 1-2.  20 C.F.R. § 404.1568,

Social Security Ruling 00-4p.

Having reviewed the DOT listings, the undersigned finds the job categories identified by

the VE are consistent with the ALJ's determination of Argenbright's residual functional capacity

and the DOT.  The VE did not specify any DOT numbers in his testimony.  In her brief,

Argenbright selects three DOT numbers for these jobs, all of which have a SVP rating above the

unskilled level.  Not only did the VE not specify the DOT numbers upon which Argenbright

24

founds her argument, there appear to be other jobs falling within the titles selected by the VE which are both sedentary and unskilled. For example, information clerk, DOT 237.367-046, and order clerk, DOT 209.567-014, are both sedentary positions with an SVP rating of 2. Argenbright's argument focusing on the three DOT job numbers she selected does not, therefore, establish that the VE's testimony was inconsistent with the DOT. The VE's testimony provides sufficient evidentiary basis for the Commissioner's finding at step five of the sequential evaluation process for disability determination. Accordingly, the undersigned finds the ALJ's determination that there are significant numbers of jobs available for a person with Argenbright's limitations is supported by substantial evidence.

## VI.

Based on the foregoing, it is the recommendation of the undersigned that plaintiff's motion for summary judgment be denied and defendant's motion for summary judgment be granted.

In making this recommendation, the undersigned does not suggest that plaintiff is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability for all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. It is recommended, therefore, that defendant's motion for summary judgment be granted.

The Clerk is directed immediately to transmit the record in this case to the Hon. Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they

25

are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

**ENTER:** This _15_ day of November, 2006.

Michael F. Urbanski
United States Magistrate Judge